IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |
|---|---|
| JAMES EAST,<br>by his next friend and guardian,<br>CYNTHIA GONZALES<br><br>        Plaintiff,<br><br>   v.<br><br>CHRIS TRAYLOR, in his official capacity as<br>COMMISSIONER, TEXAS DEPARTMENT<br>OF AGING AND DISABILITY SERVICES,<br>and THOMAS SUEHS, in his official capacity<br>as EXECUTIVE COMMISSIONER, TEXAS<br>HEALTH AND HUMAN SERVICES<br>COMMISSION,<br><br>        Defendants. | CIVIL ACTION NO. 1:10-cv-775 |

## PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT

James East ("James"), by his next friend and guardian Cynthia Gonzales, complaining of and against Chris Traylor, in his official capacity as Commissioner of the Texas Department of Aging and Disability Services ("DADS"), and Thomas Suehs, in his official capacity as Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"), alleges:

### INTRODUCTION

1.    Cynthia Gonzales brings this action on behalf of her twenty-one-year-old medically fragile ward, James, whom Defendants have indicated that they will deprive, on October 21, 2010, of the private-duty nursing services he needs to survive.

2.    James has been medically diagnosed with, among other things, Duchenne muscular dystrophy, Fragile X syndrome, dysphagia, hypercapneic respiratory failure, hypostatic

pneumonia, tachycardia, gastroesophageal reflux disease, scoliosis, sleep apnea, osteopenia, intestinal bacterial overgrowth, and mental retardation.  James has undergone gastrostomy and tracheostomy procedures, and he is dependant on a ventilator.

3.      As a result of these medical conditions, James requires continuous skilled care.  A skilled caretaker, among other things, must

- suction James's secretions frequently to maintain the integrity of his airway;

- closely monitor his respiratory status, oxygen saturation level, and ventilator settings;

- administer respiratory treatments several times a day;

- continuously monitor James's cardiac and neurological status;

- frequently reposition James to prevent skin breakdown; and

- administer his medications through a gastrostomy tube.

Without constant attention to his many complex medical needs, James is at extreme risk of death.

4.      James is twenty-one years old.  He currently lives with his guardian, Cynthia Gonzales.  Until now, James has been able to receive the nursing services he requires to survive in his home because he is eligible for Medicaid-funded services.  For years, the Texas Health Steps Comprehensive Care Program ("CCP") and the Medically Dependent Children Program ("MDCP") have provided him with 154 hours of private-duty nursing services per week. However, once individuals turn twenty-one, they are no longer eligible for CCP and MDCP. Consequently, prior to James's twenty-first birthday, he sought services under a Medicaid waiver program that serves adults, the Home and Community-based Services ("HCS") program, as well as additional funding under a state-funded program, Rider 36, so that his medical needs could continue to be met in his home after he turned twenty-one.  Rider 36 is a state-funded program under which individuals with significant disabilities whose service plans would exceed the usual

cost ceilings for long-term community care programs, such as the HCS program in which James has attempted to enroll, can receive medically necessary services, including nursing, in community settings.

5.      In a letter from DADS Assistant Commissioner Gary Jessee dated September 21, 2010, James was denied Rider 36 funds because "DADS clinical staff concluded [his] health and safety can be protected in an available living arrangement other than the HCS program."  This conclusion directly contradicts the opinion of James's primary care physician that institutionalization is inappropriate for James and that a reduction in the amount of skilled care that James receives would be medically unacceptable and would create an imminent risk of James's death.

6.      Defendants have agreed to extend James's services until October 21, 2010, at which time James will be terminated from the Texas Medicaid programs that have provided him with the private-duty nursing services he requires to stay alive while living in his home.

7.      Cynthia Gonzales's home is the only place that James has lived since he underwent a tracheostomy procedure and began relying on a ventilator, which increased the complexity of his medical care.  According to his treating medical professionals, it is the only place where his complex care needs can be met.  Despite this, Texas Medicaid plans to entirely eliminate the life-sustaining private-duty nursing care that James has received in his home simply because James turned twenty-one years old.

8.      No hearing of any kind has been held by DADS with respect to its conclusion that James's health and safety can be protected in a state facility.  Indeed, DADS Managing Attorney Marianne Reat specifically denied James's request for a hearing in an oral conversation with the undersigned, despite the fact that Rider 36 determinations in this case and others are decisive

with respect to whether Medicaid funds will be made available, and Medicaid determinations are statutorily subject to fair hearing requirements, 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.200, 431.220; 1 TEX. ADMIN. CODE § 357.3; 40 TEX. ADMIN. CODE § 9.169(a).

9.      Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12134, prohibits public entities from discriminating against qualified persons with disabilities in providing services.  Similarly, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794(a), prohibits recipients of federal funds from discriminating against qualified persons with disabilities.  The Supreme Court, in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), set out three elements that show when a state agency has discriminated against a disabled person through unnecessary institutionalization: "[T]he proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions . . . when [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."  Consistent with this federal law, Texas state law in the form of the Persons with Mental Retardation Act ("PMRA"), TEX. HEALTH & SAFETY CODE § 592.032, expressly contemplates an individual's "right to live in the least restrictive habilitation setting and to be treated and served in the least intrusive manner appropriate to the client's individual needs."

10.      In this case, Defendants have provided James with home-based services for years through various Medicaid-funded programs and have now, in disregard of all of the foregoing facts and legal standards, resolved to terminate his home-based services in their entirety, which effectively condemns James to die quickly.

11.     Because the denial of funding for services in this case does not satisfy the foregoing legal standards, because Defendants have not provided a fair hearing to James or reasonably considered or addressed the facts related to James's health and safety, and because the denial of funding for services effectively condemns James to a quick death,  James's guardian, Cynthia Gonzales, brings this action on James's behalf, seeking to require Defendants to provide James an administrative fair hearing to appeal the denial of Rider 36 funding, enjoin the denial of funding for nursing services pending the outcome of that fair hearing, continue the funding for James's home care that is essential to his survival, and obtain declaratory relief that Defendants' denial of funding for nursing services for James East in his home violates 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and implementing regulations, 28 C.F.R. §§ 35.130(d), 41.51(d), as well as TEX. HEALTH & SAFETY CODE §§ 592.013, 592.032.

## PARTIES

12.     Cynthia Gonzales is the guardian for Plaintiff James East.  Ms. Gonzales and James reside in Bell County.

13.     Defendant Chris Traylor is the Commissioner of the Texas Department of Aging and Disability Services.  DADS is a state agency with principal offices at 701 West 51st  Street, Austin, Texas 78714.  Commissioner Traylor may be served at that location.

14.     Defendant Thomas Suehs is the Executive Commissioner of the Texas Health and Human Services Commission.  HHSC is a state agency with principal offices at 4900 North Lamar Blvd., Austin, Texas 78751.  Executive Commissioner Suehs may be served at that location.

## JURISDICTION

15.     Jurisdiction is conferred on this court by 28 U.S.C. §§ 1331, 1343, 1367. Declaratory relief is authorized under 28 U.S.C. §§ 2201, 2202.

16.     Plaintiff's discrimination claims are brought pursuant to, *inter alia*, 42 U.S.C. § 12133, 29 U.S.C. § 794(a), and 42 U.S.C. § 1983.  Plaintiff's due process claims are brought pursuant to, *inter alia*, the United States Constitution and 42 U.S.C. § 1983.

## VENUE

17.     Pursuant to 28 U.S.C. § 1391(b)(1)–(2), venue is proper in the United States District Court for the Western District of Texas because Defendants reside in the Western District and a substantial part of the events giving rise to this cause of action occurred in the Western District.

## BACKGROUND FACTS

<u>James East and His Medical Condition</u>

18.     James, a severely disabled twenty-one-year-old adult, has been medically diagnosed with, among other things, Duchenne muscular dystrophy, Fragile X syndrome, dysphagia, hypercapneic respiratory failure, hypostatic pneumonia, tachycardia, gastroesophageal reflux disease, scoliosis, sleep apnea, osteopenia, intestinal bacterial overgrowth, and mental retardation.  James has undergone gastrostomy and tracheostomy procedures, and he is dependant on a ventilator.  James is eligible for Medicaid services.

19.     As a result of his various medical conditions, and as stated above in paragraph 3, James requires round-the-clock skilled nursing care, without which he will quickly die.  Dr. John Bowling, James's primary care physician, has stated unequivocally in a sworn affidavit that "[a]

reduction in the level of skilled care that [James] receives would be medically unacceptable and would create an imminent risk of death."

20.     James can only receive the continuous one-on-one monitoring and care by licensed nurses deemed medically necessary by his treating physicians in his home. Institutionalization would be fatal.

The Texas Medicaid Program

21.     The Medicaid program is a joint federal- and state-funded program enacted to provide necessary medical assistance to needy aged or disabled persons and families with dependent children, whose income and resources are insufficient to meet the cost of care.  42 U.S.C. § 1396.  States choosing to participate in the Medicaid program must operate the program in conformity with federal statutory and regulatory requirements.  42 U.S.C. § 1396a.

22.     Each State participating in the Medicaid program must submit a Medicaid plan to the Secretary of the United States Department of Health and Human Services for approval.  42 U.S.C. § 1396.  Each State must also designate a single state agency to administer and/or supervise the administration of the State's Medicaid plan.  42 U.S.C. § 1396a(a)(5).  HHSC is the Medicaid single state agency in Texas.

23.     Through a federally approved waiver, states have the option of covering home and community-based services for persons who would otherwise require institutional care that would be paid for by Medicaid.  42 U.S.C. § 1396n(c)(1).  Under the waiver authority, the Secretary of the United States Department of Health and Human Services may grant waivers of specified requirements like service limitations that are otherwise applicable to the State's Medicaid plan.  42 U.S.C. § 1396n(c)(3).  Medicaid home and community-based waiver programs enable states to provide the level of services a person would typically receive in an

institutional setting in his or her own home or some other community setting.   42 U.S.C. § 1396n(c)(1).

24.     Texas has implemented federally approved home and community-based care waiver programs in its Medicaid program.   HHSC has delegated to DADS the authority to operate home and community-based Medicaid waiver programs for persons requiring either a nursing facility level of care or an Intermediate Care Facility for the Mentally Retarded ("ICF/MR") level of care.

25.     DADS operates a federally approved home and community-based waiver program for Texans diagnosed with mental retardation called the Home and Community-based Services ("HCS") waiver.  This waiver provides medical assistance to Medicaid recipients diagnosed with mental retardation in the home and other community-based placements without regard to age. The purpose of the HCS program is to provide medical assistance to persons diagnosed with mental retardation in the community as an alternative to institutional care.   40 TEX. ADMIN. CODE § 9.154.  HCS program services are designed to assure the individual's health and welfare in the community and prevent the individual's admission to an institution.   40 TEX. ADMIN. CODE § 9.154.  Services available through the HCS waiver program include case management, supported employment, day habilitation, respite, dental services, adaptive aids, minor home modifications, specialized therapies, social work services, psychological services, occupational therapy, physical therapy, audiology, speech and language pathology, dietary services, and licensed nursing services.  Private nursing services, such as the services James currently receives through CCP and MDCP, are also available.

<u>Defendants' Decision to Terminate Services to James in His Home</u>

26.     Prior to the approach of James's twenty-first birthday on July 19, 2010, and until his CCP and MDCP nursing services terminate on October 21, 2010, Texas Medicaid determined that James's medical needs could be met in his home.  To meet his needs, Defendants authorized 154 hours of private-duty nursing services each week.  These services were provided by a licensed registered nurse or licensed vocational nurse in James's home.

27.     For years, his treatment team has determined that providing private-duty nursing services to James in his home was the most appropriate way to meet his complex medical needs.

28.     While he was under the age of twenty-one and until October 21, 2010, James is receiving services from CCP and MDCP.  Under these programs, James receives 154 hours per week of private-duty nursing care.  While receiving CCP services, James qualifies for and receives all of his prescription medications each month.

29.     Medicaid recipients like James lose their eligibility for CCP and MDCP services, including private-duty nursing services through these programs, when they turn twenty-one years old.  For James, the only available option to remain at home and to continue receiving care in a community setting is to attempt to transition to one of the home and community-based waiver programs, such as the HCS program.

30.     Beginning with Texas's 80th legislative session, the State of Texas modified its HCS waiver and other waiver programs, with approval from the Center for Medicare and Medicaid Services.  These modifications increased the cost ceiling for the HCS program to 200% of the average per capita cost of providing service to an individual in an ICF/MR facility and created a program that allows HCS recipients to receive additional funding, above the 200% cost ceiling,  for community-based services.

31.     Under the General Appropriations Act, 81st Legislature, Regular Session, 2009, Article II, DADS Rider 36 ("Rider 36"), HCS waiver recipients who live at home are potentially eligible to receive up to 200% of the annual cost of services in an ICF/MR.  As long as the HCS service request is at or below 200%, Program Enrollment and Utilization Review at DADS can approve the recipient's Individual Plan of Care ("IPC").  Under this process, if DADS denies funding for the requested services on the IPC, HCS applicants or recipients are entitled to request an administrative hearing to challenge the denial.

32.     For individuals such as James, whose home care needs exceed the 200% cost limit, Rider 36, TEX. HUM. RES. CODE § 32.058(e), and 40 TEX. ADMIN. CODE § 40.1 specify that DADS may use General Revenue funds to pay for services above the individual cost limit of a waiver program.  These individuals may request funding from state general revenue funds to cover medically necessary services that are projected to have costs in excess of the 200% cost limit.  To qualify for general revenue funded waiver services, DADS must determine that (1) the individual's health and safety cannot be protected by the services provided within the individual cost limit established for the HCS program and (2) there is no other available living arrangement in which the individual's health and safety can be protected.  *See* General Appropriations Act, 81st Legislature, Regular Session, 2009, Article II, DADS Rider 36; TEX. HUM. RES. CODE § 32.058(e); 40 TEX. ADMIN. CODE § 40.1.  Unlike services provided at or under the 200% cost limit, where there are federal funds in addition to State funds that pay for HCS waiver services, under Rider 36, general revenue funds do not qualify for matching federal funds to pay for HCS waiver services over 200%.  In addition, unlike individuals with projected service costs at or below 200%, who are entitled to a hearing to dispute service denials, individuals denied Rider 36

funds are denied due process rights and cannot challenge funding denials in an administrative forum.

33.     Prior to James's twenty-first birthday, Rider 36 funds were requested on his behalf so that he could continue to live in his home and receive the medically necessary nursing services he requires to survive.

34.     As of James's twenty-first birthday on July 19, 2010, Defendants had not made a decision on James's Rider 36 funding request and agreed to extend the 154 hours per week of nursing services he had received while under twenty-one until September 30, 2010.

35.     Finally, DADS denied James's Rider 36 request in a letter dated September 21, 2010.  Defendants denied Plaintiff's request for an administrative hearing to challenge the denial of Rider 36 funding.  Defendants have agreed to extend James's current level of services through October 21, 2010.

36.     Without the nursing and other services that James currently receives, his guardian will be unable to continue to care for James in her home as she is unable to personally provide James with the round-the-clock skilled care he requires.  Because James was denied Rider 36 funds, he will be forced to leave his home and enter an institutional setting that is unable to meet his needs.

37.     On October 21, 2010, when James is terminated from the CCP and MDCP programs, his nursing provider will entirely discontinue providing nursing services to him. Although DADS Special Initiatives Coordinator Cathryn Horton orally informed the undersigned on September 23, 2010, that DADS has located a nursing home that can meet James's needs and that she would provide the name of the facility to the undersigned by e-mail, the undersigned has not received such an e-mail.  Absent intervention, James will be placed in an institutional setting

that is wholly inappropriate to meet his need for constant supervision and round-the-clock care, and his life will be placed in imminent danger.

The Effects of Removing James East from His Home

38.     If James is moved from his guardian's home and into a state supported living center or other institutional setting such as a nursing home, James would require the individualized services of a registered nurse or licensed vocational nurse for twenty-four hours each day.  A state supported living center, or other institution, will have to provide to James twenty-four hours per day of private-duty nursing, which is "nursing services for recipients who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility."  42 C.F.R. § 440.80.

39.     State supported living centers in Texas vary in size.  They can house anywhere from around 100 to well over 600 individuals.  In these institutions, residents do not have individual rooms, but instead must share a room with four or five other residents.  The resident rooms are located on large wards, housing approximately 100 individuals.

40.     Texas state supported living centers, which are operated by DADS, have come under considerable scrutiny in recent years following a Department of Justice investigation that found rampant abuse and neglect of residents of the Lubbock State Supported Living Center facility.  The Department of Justice has since investigated other state supported living center facilities and continues its oversight of the Texas state supported living center system.  These investigations call into serious question the appropriateness of the institutional placements for some of our most vulnerable citizens, people diagnosed with mental retardation.

41.     As part of a settlement agreement between the state of Texas and the U.S. Department of Justice, three teams of professionals in the field of intellectual and developmental

disabilities have been assigned responsibility for conducting a baseline review and subsequent on-site compliance monitoring visits at each of the twelve state supported living centers in Texas as well as at the ICF/MR component of the Rio Grande State Center.  Each of the three teams of professionals is under the direction of a lead monitor who was jointly selected by the state of Texas and the U.S. Department of Justice.

42.     So far, the monitors have issued baseline reports for every facility and compliance reports for four of the facilities.  Every single report identifies deficiencies relating to the assessment of risk for aspiration or interventions related to aspiration.  Because James is at extreme risk for aspiration, a state supported living center is a wholly inappropriate placement for him.

43.     James's medical needs cannot be met in an institutional setting at a cost less than the cost of caring for him in his home.

44.     James's health and safety cannot be protected by the services that would be available to him with an allocation at or below 200% of the ICF/MR rate, and there is no available living arrangement other than his home in which his health and safety can be protected.

<u>Caring for James East in His Home</u>

45.     In order for James to be able to remain in his home, he must maintain the level of services that the State of Texas has been providing him—the services of a registered nurse or licensed vocational nurse for at least 154 hours each week.  While James was under twenty-one years of age, Texas Medicaid officials determined that his medical needs could be met in his home, and Medicaid covered all of the costs of James's in-home medical care.  Texas Medicaid repeatedly approved James's home care plan as a safe and necessary means for meeting his complex needs.

46.     Cynthia Gonzales loves James dearly and wants James to remain in her home. James has been lovingly cared for in her home.  James has outlived all conceivable expectations for his life span, and this is directly attributable to the excellent care and loving environment provided by his guardian.

47.     James's need for an intensive level of individualized nursing services and the appropriateness of meeting James's nursing and other medical needs at home are not changed by virtue of his turning twenty-one years old.

Defendants' Failure to Serve James East in the Least Confining, Most Integrated Setting

48.     If James were placed in a state supported living center or a nursing facility, the Texas Medicaid program would pay all the costs of his care.

49.     With no statutory or regulatory modifications and only minimal modifications to practices, DADS and HHSC could continue to fund the cost of James's care in his home in an amount less than the cost of caring for James in an institution.

50.     James will still require round-the-clock one-on-one nursing services if placed in an institution.  However, Defendants have not made assurances that James will continue to receive this level of care in an institutional setting.

51.     Failure to provide James with constant skilled supervision is tantamount to a death sentence for this young man.  Defendants' proposed termination of James's in-home nursing services places James's health and life in serious jeopardy.

52.     As an individual with a disability, James receives Supplemental Security Income ("SSI") benefits in the amount of $674 per month.  This is James's only income.  Thus, he is unable to post bond or other security for purposes of seeking the relief requested herein.

53.     The attorney for Plaintiff notified attorneys within HHSC and DADS on or about October 15, 2010 that this complaint, along with a Motion for Temporary Restraining Order and Preliminary Injunction, would be filed if James's nursing services were terminated.

## CAUSES OF ACTION

### Violations of Due Process, federal Medicaid law, 42 U.S.C. § 1983, and the Texas Administrative Code

54.     Plaintiff hereby incorporates by reference paragraphs 1 through 53 of this Complaint.

55.     James's eligibility for and receipt of Medicaid services creates a property right subject to due process protection under the Fourteenth Amendment to the Constitution of the United States and Article I, § 19 of the Texas Constitution.

56.     Texas regulations specifically provide for a fair hearing as required by 42 C.F.R. Part 431, subpart E, to Medicaid recipients who are denied waiver program services.

57.     Defendants have not provided James the necessary procedural protections.

58.     By denying Plaintiff the opportunity for a fair hearing to challenge the denial of the funding that would have allowed HCS waiver services to be provided, Defendants have violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, Article I, § 19 of the Texas Constitution, federal Medicaid law and regulations, and state regulations.

59.     James is entitled to a fair hearing with respect to Defendants' denial of state general revenue funds that are inextricably intertwined with Medicaid-funded services. *Knowles v. Horn*, No. 3:08-CV-1492-K, 2010 WL 517591, at *6 (N.D. Tex. Feb. 10, 2010); *see also* 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.200, 431.220; 1 TEX. ADMIN. CODE § 357.3; 40 TEX. ADMIN. CODE § 9.169(a).

60.     Defendants are liable for the violations of federal constitutional and statutory law pursuant to 42 U.S.C. § 1983.

61.     Defendants' acts will cause James irreparable injury for which there is no adequate remedy at law.

### Violations of the ADA and Section 504

62.     Plaintiff hereby incorporates by reference paragraphs 1 through 61 of this Complaint.

63.     Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, prohibits public entities from discriminating against qualified persons with disabilities in the delivery of services.  Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794(a), prohibits recipients of federal funds from discriminating against qualified persons with disabilities.  Policies and practices that have the effect of unjustifiably segregating persons with disabilities in institutions constitute prohibited discrimination under these Acts.

64.     DADS and HHSC are public entities within the meaning of that term under Title II of the ADA.

65.     DADS and HHSC are recipients of federal funds within the meaning of that term under Section 504.

66.     James is a qualified individual with a disability under the ADA and Section 504.

67.     Under 28 C.F.R. § 35.130(d), implementing Title II of the ADA, public entities must administer services in the most integrated setting appropriate to the needs of qualified individuals with disabilities.  This same requirement applies to recipients of federal funds under the regulations implementing the Rehabilitation Act.  28 C.F.R. § 41.51(d).

68.     James's home constitutes the most integrated, least restrictive, and least confining setting for him.

69.     Defendants' acts constitute unlawful discrimination under 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and violate the integration mandate of the regulations implementing these statutory prohibitions against discrimination, 28 C.F.R. §§ 35.130(d), 41.51(d).

70.     Defendants' termination of Medicaid funding for the life-sustaining nursing services James requires to avoid institutionalization violates the Americans with Disabilities Act and in particular 42 U.S.C. §§ 12131–12134 and the implementing regulations at 28 C.F.R. § 35.130(d), which require Defendants to make services available in the community rather than in institutions.

71.     Defendants' termination of Medicaid funding for the life-sustaining nursing services James requires to avoid institutionalization violates the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) and the implementing regulations at 28 C.F.R. § 41.51(d), which require Defendants to make services available in the community rather than in institutions.

72.     Defendants' actions will cause James irreparable injury for which there is no adequate remedy at law.

**Violations of the PMRA**

73.     Plaintiff hereby incorporates by reference paragraphs 1 through 72 of this Complaint.

74.     The purpose of the Persons with Mental Retardation Act ("PMRA"), TEX. HEALTH & SAFETY CODE §§ 591.001–597.054, is to promote the rights of individuals diagnosed with mental retardation to live at home. *Id.* §§ 591.002(d), 592.013(3), 592.032. The PMRA expressly contemplates an individual's right to receive services in an environment that is "the

least confining for a client's condition . . . and provided in the least intrusive manner reasonably and humanely appropriate to the person's needs."  Id. §§ 591.005(1)–(2), 592.032.

75.     James is a person as defined within the PMRA.

76.     James is entitled to receive services in his home as opposed to a nursing facility or state facility for persons with mental retardation because there is available state funding to provide James with services in his home, which is both his least restrictive alternative and his least restrictive living environment, as contemplated by TEX. HEALTH & SAFETY CODE §§ 591.005, 592.013, 592.032.

77.     Defendants' actions with respect to James as described herein violate his right as a person diagnosed with mental retardation to receive services in his own home, his least restrictive environment, and will cause James irreparable injury for which there is no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

A.     That this Court assume jurisdiction of this cause;

B.     That this Court appoint Cynthia Gonzales as James East's next friend to represent his interests in this lawsuit;

C.     That this Court enter a declaratory judgment that Defendants' failure to offer Plaintiff a fair hearing to appeal the DADS decision to deny him state general revenue funding, which led to the decision to deny him HCS services, violated his due process rights, as well as federal Medicaid law and the Texas Administrative Code;

D.     That this Court enter a declaratory judgment that Defendants' denial of funding for nursing services for James East in his home violates 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and their implementing regulations, 28 C.F.R. §§ 35.130(d), 41.51(d), as well as TEX. HEALTH & SAFETY CODE §§ 591.001–597.054;

E.     That this Court enter a preliminary and permanent injunction requiring Defendants to provide James with an administrative fair hearing on the denial of Rider 36 funding and enjoining Defendants from denying funding for current levels of nursing services for James East in his home pending the outcome of that hearing, or in the alternative, a preliminary and permanent injunction enjoining Defendants from discontinuing the level of home-based private-duty nursing Defendants have been providing to James at his home pending the outcome of *Traylor v. Knowles*, No. 10-10246 (5th Cir. filed Aug. 2, 2010);

F.     That this Court issue a temporary restraining order, directed to Defendants, as well as Defendants' officers, agents, servants, employees, and attorneys, and any and all persons in active concert or participation with them, restraining them from terminating James East's life-sustaining nursing services, such temporary restraining order to remain in effect until a hearing may be held on his application for preliminary injunction;

G.     That this Court award Plaintiff his costs and fees; and

H.     That this Court grant such additional relief as it deems equitable and just.

Respectfully submitted,

MATT BACHOP
State Bar. No. 24055127
ADVOCACY, INCORPORATED
7800 Shoal Creek Boulevard, Suite 142-S
Austin, Texas 78757
(512) 454-4816 (Phone)
(512) 302-4936 (Fax)

E-mail: mbachop@advocacyinc.org

ATTORNEY FOR PLAINTIFF

## VERIFICATION

THE STATE OF TEXAS       §
                                    §

COUNTY OF BELL          §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Cynthia Gonzales, legal guardian and next friend of James East, who, in her capacity as guardian and next friend, after being by me duly sworn, upon her oath stated that she has personal knowledge of the facts concerning James East stated in the foregoing Plaintiff's Original Verified Complaint and that each and every statement of fact concerning James East contained therein is true and correct.


Cynthia Gonzales


SUBSCRIBED AND SWORN TO BEFORE ME on the _Seventh_ day of October, 2010, to certify which witness my hand and official seal.

DELLA DAPHINE GILPIN
Notary Public, State of Texas
My Commission Expires
June 24, 2014

Notary Public in and for the State of Texas